**SMITHKLINE BEECHAM CORP.,**
**d/b/a GlaxoSmithKline,**
**Plaintiff,**

v.

**EXCEL PHARMACEUTICALS**
**INC., Defendant.**

No. 2:02–CV–51.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 2, 2002.

Kristan B. Burch, Stephen E. Noona, Kaufman & Canoles, PC, Norfolk, VA, Gregory S. Lewis, Morgan, Lewis & Bockius, LLP, McLean, VA, for Plaintiff.

Walter D. Kelley, Jr., Michael E. Anderson, Troutman Sanders, LLP, Norfolk, VA, Madison Jellins, William G. Gaede, III, Cooley Godward, LLP, Palo Alto, CA, Jonathan G. Graves, Cooley Godward, LLP, Reston, VA, for Defendant.

## *OPINION*

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on defendant's motion for summary judgment of non-infringement, pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, defendant's motion is GRANTED.

### I. *Factual and Procedural History*

Plaintiff SmithKline Beecham Corp., d/b/a/ GlaxoSmithKline ("Glaxo"), holds U.S. Patent No. 5,427,798 ("the '798 patent") on sustained-release tablets of the anti-depressant drug bupropion hydrochloride. Glaxo is the holder of the Federal Drug Administration ("FDA") approved New Drug Application ("NDA") for this drug, and commercially markets the drug

under the name Wellbutrin®SR.[1] As required by statute, the NDA for Wellbutrin®SR provides detailed studies of the safety and efficacy of the drug. *See* 21 U.S.C. § 355(a), (b)(1) (1999). The drug and its associated patents are listed annually, with a series of monthly updates, in *Approved Drug Products with Therapeutic Equivalence Equations,* otherwise known as the "Orange Book."

Prior to the expiration of the '798 patent, defendant Excel Pharmaceuticals Inc. ("Excel") filed an Abbreviated New Drug Application ("ANDA") with the FDA, seeking approval to manufacture and sell a generic version of Glaxo's Wellbutrin®SR product. Filing an ANDA allowed Excel to undertake an expedited approval process by relying on the safety and efficacy studies supplied in the NDA for Wellbutrin®SR.[2] In its ANDA, Excel represented to the FDA all of the ingredients that would be included in its generic product. Excel also certified to the FDA its belief that its generic drug, when produced, would not infringe upon the '798 patent held by Glaxo: this certification is commonly known as a paragraph IV certification. *See, e.g., Andrx Pharms., Inc. v. Biovail Corp.,* 276 F.3d 1368, 1371 (Fed. Cir.2002). Excel sent a copy of the paragraph IV certification to Glaxo. (Boehm Decl., Ex. B.) If Glaxo believed that Excel's proposed product would infringe upon any of its patents for Wellbutrin®SR, it

had forty-five days in which to commence an infringement action against Excel. *See* 21 U.S.C. § 355(j)(5)(B)(iii) (1999). On January 25, 2002, Glaxo filed a timely complaint against Excel in the Alexandria Division of this court, pursuant to 35 U.S.C. § 271(e)(2)(A), alleging that Excel's proposed product would infringe upon the '798 patent.[3] The suit was subsequently transferred to the Norfolk Division of the court. Because Glaxo filed suit against Excel, the FDA may not approve the ANDA until the resolution of this suit, the expiration of the patent, or thirty months after Glaxo's receipt of the Paragraph IV notice, whichever is earliest. *See* 21 U.S.C. § 355(j)(5)(B)(iii)(I)-(III) (1999).

Excel filed an answer and counterclaim to Glaxo's complaint on February 5, 2002. On February 13, 2002, Excel filed a motion for summary judgment of non-infringement. On February 25, 2002, Glaxo filed a cross-motion, pursuant to Federal Rule of Civil Procedure 56(f), seeking discovery to permit a complete summary judgment response; Glaxo also filed a memorandum in opposition to Excel's motion for summary judgment. Excel filed its first amended counterclaims on February 27, 2002. On February 28, 2002, Excel filed a reply to Glaxo's response to the motion for summary judgment. On March 8, 2002, Glaxo filed a reply to Excel's response to the cross-motion seeking an extension of time to conduct discovery.[4] On March 12, 2002,

1. Glaxo also holds the FDA approved NDA for sustained-release bupropion hydrochloride tablets to help aid in smoking cessation. The company commercially markets this product under the name Zyban ®.

2. Excel's duties with regard to filing the ANDA are governed by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984), codified at 21 U.S.C. §§ 355, 360cc, and 35 U.S.C. §§ 156, 271 (known as the

Hatch Waxman Amendments to the Federal Food, Drug, and Cosmetic Act ("FFDCA")).

3. On January 24, 2002, Glaxo filed an identical suit against Excel in the United States District Court for the District of New Jersey. The suit currently is pending before the Honorable William H. Walls.

4. Both parties also submitted briefs on a recently decided case addressing the '798 patent. In *Glaxo Wellcome, Inc. v. Andrx*

Glaxo filed an answer to Excel's amended counterclaims.

On April 12, 2002, this court held a hearing on Excel's motion for summary judgment and on Glaxo's cross-motion for an extension of time to conduct discovery. The court ruled from the bench and denied Glaxo's cross-motion for an extension of time to conduct discovery. The court took Excel's motion for summary judgment under advisement, at which time the case of *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed.Cir. 2000), was on appeal to the Supreme Court. On May 28, 2002, the Supreme Court vacated the Federal Circuit's decision in *Festo. See* — U.S. —, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Because the Supreme Court's holding directly impacted this case, the court entered an order on June 3, 2002, granting leave to both parties to submit supplemental briefs to address the Supreme Court's opinion. Glaxo submitted a supplemental brief on June 17, 2002. Excel submitted a responsive brief on June 24, 2002. This matter is now ripe for review.

## II. Standard of Review

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Fed.R.Civ.P.* 56(c); *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 529–30 (Fed.Cir.1995). Summary judgment in a patent case requires the court to engage in a two-step process. First, the court

must determine the scope of the patent's claims. *See Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1565 (Fed.Cir.1997). Determining the scope of a patent claim is a legal issue to be determined exclusively by the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–78 (Fed.Cir.1995).

The second step is for the court to determine if there is a material factual dispute regarding whether the accused device infringes upon the claims, either literally or under the doctrine of equivalents. *See Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358, 359 (Fed.Cir.1996). Because this infringement suit is based upon Excel's ANDA, the court's focus for this second step should be on "what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1248 (Fed.Cir. 2000) (quoting *Glaxo, Inc.*, 110 F.3d at 1569).

## III. Analysis

The patent on bupropion hydrochloride (U.S. Patent No. 3,819,706), which is the active drug in the Wellbutrin®SR, expired in 1991. ('706 patent, 1:1–1:10.) The '798 patent is directed to a tablet providing for the controlled sustained release of bupropion hydrochloride into the bloodstream. (Ascher Decl. ¶ 5; Lowman Decl. ¶ 11–12.) To control the release rate of bupropion hydrochloride, the active drug is blended with hydroxypropyl methylcellulose ("HPMC") to form an admixture of powders. (Specification 1:67–2:4, 2:40–45.)[5] In its ANDA, Excel lists polyvinyl alcohol ("PVA"), rather than HPMC, as the poly-

---

*Pharms., Inc.*, 190 F.Supp.2d 1354 (S.D.Fla. 2002), Judge Wilkie D. Ferguson, Jr., ruled that Andrx's ANDA's, seeking approval to market generic versions of Wellbutrin®SR and Zyban®, did not infringe upon the '798 patent. The court finds the reasoning employed by Judge Ferguson to be persuasive,

particularly his discussion regarding claim construction.

5. The admixture of powders also contains microcrystalline cellulose, which makes the admixture compressible. (Specification 2:57–60.)

mer used to control the release rate of bupropion hydrochloride into the bloodstream.[6] (Boehm Decl., Ex. A.) Both PVA and HPMC are hydrogel-forming polymers; by forming a "gel" within the stomach, these polymers retard the release of the active ingredient bupropion hydrochloride. (Lowman Decl. ¶ 20.) Glaxo claims that PVA is functionally equivalent to HPMC and that Excel's proposed product, therefore, would infringe upon the '798 patent under the doctrine of equivalents. (*Id.* ¶¶ 19–20.)

Excel proffers four arguments as to why it is entitled to summary judgment on Glaxo's claim of infringement: (1) its proposed product does not literally infringe upon the '798 patent; (2) its proposed product does not infringe upon the '798 patent under the doctrine of equivalents; (3) prosecution history estoppel bars the plaintiff from claiming infringement under the doctrine of equivalents; and (4) Glaxo's theory under the doctrine of equivalents would necessarily vitiate the admixture limitation contained in the '798 patent.[7] The first step the court must take before addressing these arguments is to construe the scope of the claims at issue in this suit. *See Glaxo, Inc.,* 110 F.3d at 1565.

### A. Claim Construction

For the purposes of this motion for summary judgment, Excel contends that its use of PVA to control the release rate of bupropion hydrochloride does not infringe upon the HPMC limitation within the '798 patent, either literally or under the doctrine of equivalents. Thus, the claims that must be construed by this court are the ones containing the HPMC limitation. The limitation appears in claims 1, 3, 6, 7, 13–15, and 17–19.

To properly construe the claims, the court considers three sources: the language of the claims, the patent's specification, and the prosecution history. *See Markman,* 52 F.3d at 979. For obvious reasons, claim construction begins with the language of the claims themselves. *See Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1464 (Fed.Cir.1998). The court should next consider the patent specification and, finally, the prosecution history. *See id.* To the extent extrinsic evidence is useful to understanding the patent, the court may consider such evidence. *See Markman,* 52 F.3d at 980. However, extrinsic evidence may not be used to vary or contradict the terms of a claim. *See id.* at 981. Within these parameters, the court now turns to the issue of construing the relevant claims.[8]

### 1. Independent Claims 3, 6, 7, 13–15

Independent claims 3, 6, 7, and 13–15 all describe a controlled sustained release tab-

---

**6.** In its brief in support of its motion for summary judgment, Excel indicates that its ANDA contemplates povidone in an admixture with bupropion hydrochloride. (Brief Supp. Def.'s Mot. Summ. J. at 2.) Later in the brief, Excel indicates that its ANDA contemplates PVA in an admixture with bupropion hydrochloride. (*Id.* at 5.) A review of the ANDA reveals that Excel proposes to blend PVA with bupropion hydrochloride (and glyceryl behenate) to form an admixture comprising the tablet's core. Povidone is one of the compounds comprising the tablet's coating. (Boehm Decl., Ex. A.)

**7.** Given the court's rationale in granting summary judgment, *see infra* at III.B.2.a.i.-ii., the court need not address Excel's fourth argument in support of summary judgment.

**8.** The court finds a hearing unnecessary in this case to construe the relevant claims. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 981 (Fed.Cir.1995) ("A trial judge has sole discretion to decide whether or not he needs, or even desires, an expert's opinion to understand a patent.") (quoting *Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir.1984)).

let comprising an admixture of bupropion hydrochloride and HPMC. (Brief Supp. Def.'s Mot. Summ. J., Ex. A.) To interpret the scope of these claims, they "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification provides the following guidance:

> In order to prepare the controlled sustained release (SR) tablets of this invention, particles of bupropion hydrochloride are preferably blended with microcrystalline cellulose and hydroxypropyl methylcellulose (Methocel®) to form an admixture of blended powders.

(Specification 2:40–46.) This indicates that the admixture described in claims 3, 6, 7, and 13–15 refers to a blend of bupropion hydrochloride and hydroxypropyl methylcellulose ("HPMC"). The specification also provides guidance as to the purpose of this admixture: "This invention is directed to control sustained release (SR) tablets containing bupropion hydrochloride (as the active drug or active ingredient), [and] preferably hydroxypropyl methylcellulose (Methocel®) for controlling drug release rate . . . ." (Specification 1:67–2:2.) Thus, the language of these claims, read in view of the specification, clearly indicates that the claims contemplate the use of HPMC to control the release rate of bupropion hydrochloride into the bloodstream.

The prosecution history confirms the significance of HPMC to these claims. Claims 13–15 as originally written did not contain the HPMC limitation. (Brief Supp. Def.'s Mot. Summ. J., Ex. B.) The examiner rejected claims 13–15, noting that "[HPMC] is considered critical for controlled and/or sustained release and should be incorporated into the independent claims." (*Id.*, Ex. C.) The patentee opted not to contest this determination and accordingly amended claims 13–15. The examiner's rejection of the claims that did not originally include the HPMC limitation confirms the significance of this limitation to the '798 patent.

Finally, an affidavit submitted by one of Glaxo's experts provides guidance in construing these claims. Anthony M. Lowman, an Associate Professor in Drexel University's Department of Chemical Engineering, indicates that claims 14 and 15 "recite the release profiles over time in blood plasma, *i.e.*, bioavailability, of bupropion active drug after administration of a tablet comprising HPMC and . . . bupropion hydrochloride." (Lowman Decl. ¶ 16.) [9] This interpretation is consistent with the language of claims 14–15 and with the specification of the '798 patent. Moreover, this affidavit proves useful to interpreting the language in the other claims containing the HPMC limitation.

Thus, having considered the language of the claims, patent specification, prosecution history, and extrinsic evidence, the court construes claims 3, 6, 7, and 13–15 as describing a specific polymer, HPMC, that is blended with bupropion hydrochloride to form an admixture. The addition of HPMC serves to retard the release of bupropion hydrochloride into the bloodstream.

### 2. Independent Claims 17–19

Although written in slightly different language, claims 17–19 provide the same limitation as claims 13–15. The claims describe a "mixture" of bupropion hydrochloride and "means for releasing" bupropion hydrochloride over the course of an hour, "said means comprising [HPMC]." (*Id.*, Ex. A.) As with claims 13–15, these claims as originally written did not contain

---

**9.** Claim 13 is identical to claims 14 and 15 except that it varies in the dosage of bupropion hydrochloride contained within the tablet. *See infra* note 16.

the HPMC limitation. The examiner rejected these claims and did not approve the claims until the HPMC limitation was added. Thus, under the same reasoning applicable to claims 3, 6, 7, and 13–15, *supra* III.A.1., the court concludes that claims 17–19 describe a specific polymer, HPMC, that is blended with bupropion hydrochloride to form an admixture. The addition of HPMC serves to retard the release of bupropion hydrochloride into the bloodstream.[10]

### 3. Independent Claim 1

Claim 1 describes a specific ratio of HPMC to bupropion hydrochloride for each tablet. The tablets must contain between .19 to 1.1 parts HPMC to 1 part bupropion hydrochloride. Reading this claim in context of the specification, the court construes this claim as describing a specific polymer, HPMC, blended with bupropion hydrochloride in a specific ratio to form an admixture. The presence of HPMC within the admixture serves to retard the release of bupropion hydrochloride into the bloodstream.

### B. Material Dispute Regarding Infringement

Having construed the scope of the relevant claims, the next step is for the court

to determine whether a factual issue exists with regard to literal infringement or infringement under the doctrine of equivalents. *See Lifescan, Inc.*, 76 F.3d at 359. The court will address each theory in turn.

### 1. Literal Infringement

■ Claims 1, 3, 6, 7, 13–15, and 17–19 each describe HPMC in an admixture with bupropion hydrochloride. Excel's ANDA does not list HPMC in an admixture with bupropion hydrochloride.[11] (Boehm Decl., Ex. A.) To meet its burden of demonstrating literal infringement, Glaxo must prove that each limitation within its patent is "literally met by the allegedly infringing device." *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1302 (Fed. Cir.2001); *see also Glaxo, Inc.*, 110 F.3d at 1565. Thus, Excel's ANDA does not literally infringe upon these claims. Accordingly, the court GRANTS summary judgment to Excel on the issue of literal infringement.[12]

### 2. Equivalent Infringement

■ To infringe under the doctrine of equivalents, each element within Excel's ANDA must satisfy each limitation within the patent claims either literally or by equivalents. *See Digital Biometrics, Inc.*

---

10. Although claims 17–19 describe a "mixture" of bupropion hydrochloride and claims 13–15 claim an "admixture" of these compounds, for the purposes of the '798 patent, these terms are synonymous. This conclusion is confirmed by the fact that the specification uses these terms interchangeably. (*e.g.*, Specification 2:40–60.)

11. The court does note that Excel proposes to use a negligible quantity of HPMC in the coating of its generic tablets. (Boehm Decl., Ex. A.) Because Excel's proposed tablet would use only minimal amounts of HPMC, and HPMC would not form part of the admixture that forms the generic tablet's core, the pres-

ence of HPMC within Excel's ANDA does not impact this court's analysis whatsoever.

12. Glaxo contends that its only claim is for infringement under the doctrine of equivalents and, therefore, there "is no basis for any judgment" on the issue of literal infringement. (Reply Supp. Cross–Motion Seeking Discovery at 3 n. 4.) Yet, in reviewing Glaxo's initial complaint, Glaxo does not distinguish the theory under which it alleges infringement. Because Excel has filed a motion for summary judgment with respect to literal infringement, this issue is properly before the court.

*v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed. Cir.1998).[13] To determine whether an element within the ANDA is equivalent to a claim limitation, a factual finding must be made that the element differs only insubstantially from the asserted claim limitation. *See id.* Yet, there is an important limitation on the doctrine of equivalents: the doctrine may not be used to expand the protection of a patent after it has been issued. *See Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1564 (Fed.Cir.1990). Moreover, the doctrine is not available for subject matter surrendered by the patentee during prosecution. *See Festo Corp.*, 234 F.3d at 564 ("Prosecution history estoppel precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application.").[14] Thus, because "[t]he doctrine of equivalents is subservient to ... [prosecution history] estoppel," *id.*, "[p]rosecution history estoppel may enable an accused infringer to obtain summary judgment by removing the fact-intensive inquiry of equivalent infringement." *Calmac Mfg. Corp. v. Dunham–Bush, Inc.*, 929 F.Supp. 951, 962 (E.D.Va.1996). Accordingly, the court will address the issue of whether prosecution history estoppel bars Glaxo from claiming equivalent infringement with respect to the HPMC limitation within the '798 patent claims.

### a. Prosecution History Estoppel

■ Because the patentee amended several claims during prosecution of the '798 patent, prosecution history estoppel may bar Glaxo from claiming equivalent infringement. For the court to determine whether a claim amendment gives rise to prosecution history estoppel, it must first determine which claim limitations are alleged to be met by equivalents, whether the claim limitations at issue were amended during prosecution of the patent, and whether the patentee's amendment narrowed the scope of that claim. *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1358–59 (Fed.Cir.2001). If the court determines that the claims were narrowed during prosecution for reasons related to patentability, "the patentee ... bear[s] the burden of showing that the amendment [did] not surrender the particular equivalent in question." *Festo Corp.*, —— U.S. at ——, 122 S.Ct. at 1842.

In its motion for summary judgment of non-infringement, Excel claims that its use of PVA would not infringe upon the HPMC limitation in the '798 patent. Moreover, there is no dispute that the patentee amended several independent claims to include HPMC during prosecution of the '798 patent. *See supra* III. A.1.–3. Thus, pursuant to *Festo*,[15] this court must next determine whether the addition of HPMC narrowed the literal scope of these claims, and whether the

---

**13.** The Federal Circuit has indicated its preference that courts use the term "limitation" when referring to claim language and the term "element" when referring to the accused device. *Festo Corp.*, 234 F.3d at 563 n. 1. The court adopts these terms in the manner defined by the Federal Circuit.

**14.** Although the Supreme Court vacated the Federal Circuit's holding in *Festo*, the Court cited with approval the portion of *Festo* in which the Federal Circuit provided guidance for determining when prosecution history es-

toppel may apply. *See Festo Corp.*, —— U.S. at ——–——, 122 S.Ct. at 1838–40. The Supreme Court disagreed with the Federal Circuit's conclusion that prosecution history estoppel serves as a complete bar to the doctrine of equivalents. *See id.* at 1840–43. Thus, for the purpose of determining whether estoppel may apply, the Federal Circuit's opinion still provides guidance.

**15.** *See supra* note 14.

amendments were made for reasons related to patentability. *Festo Corp.*, 234 F.3d at 586.

### i. Prosecution History

Claims 14–15[16] and 18–19,[17] as originally submitted, did not list HPMC as the polymer controlling the release rate of bupropion hydrochloride into the bloodstream. On April 13, 1994, the patent examiner rejected claims 1–19 under 35 U.S.C. § 112, ¶ 1 for lack of enablement. In rejecting these claims, the examiner noted the following objection:

> The rate of release is directly related to the release retarding affect of [HPMC]. While other excipients have been disclosed, the particular cellulose is considered critical for controlled and/or sustained release and should be incorporated into the independent claims. The disclosure of a single species does not provide a basis for claiming a generic concept.

(Brief Supp. Def.'s Mot. Summ. J. Ex. C.)[18] In response to this rejection, claims 14–15 were amended to list HPMC as the polymer used to control the release rate of bupropion hydrochloride. (Brief Supp. Def.'s Mot. Summ. J., Ex. D.) Rather than amend claims 18–19, the applicant argued that the "means plus function" language of these claims sufficiently met the statutory requirements for the patent: "As for the terms 'means for releasing' in claims 17 to 19 it is noted that Section 35 U.S.C. § 112(6) of the patent laws allows 'means for' language in combination claims. That is all applicants have done. It is therefore submitted that the claims are appropriate." (*Id.*) The examiner, following a subsequent telephonic interview with the applicant, amended claims 17–19 to include HPMC. (Brief Supp. Def.'s Mot. Summ. J., Ex. G.)[19]

16. Original claim 14 contained the following language:

> A controlled sustained release tablet comprising an admixture of 100mg of bupropion hydrochloride and means for providing a shelf life of at least one year after oral administration of a single one of said tablets in adult men producing plasma levels of bupropion as free base ranging substantially between the minimum and maximum levels as shown in Fig. 5 over twenty four hours.

(Brief Supp. Def.'s Mot. Summ. J., Ex. B.) Claims 13–15 are identical except that the dosage of bupropion hydrochloride in the tablets varies in each claim: claim 13 is for 50 mg of bupropion hydrochloride, claim 14 for 100 mg of the drug, and claim 15 for 150 mg of the drug. Because Excel's ANDA seeks approval to manufacture and sell tablets containing 100 mg and 150 mg of bupropion hydrochloride, only claims 14 and 15 are relevant to this motion.

17. Claim 18, as originally written, contained the following language:

> A sustained release tablet containing an admixture of (a) 100 mg of bupropion hydrochloride and (b) means for releasing between about 25 and 45% of bupropion hydrochloride in one hour, between about 60 and 85% in four hours and not less then 80% in eight hours in distilled water.

(Brief Supp. Def.'s Mot. Summ. J. Ex. B.) Similar to claims 13–15, claims 17–19 are identical except that they vary in the dosage of bupropion hydrochloride. *See supra* note 16.

18. The examiner also rejected claims 1, 6–7, 9–15, and 17–19 under 35 U.S.C. § 112, ¶ 2 as being indefinite.

19. In *Warner–Jenkinson*, the Supreme Court held that when a patentee is unable to offer an explanation for a claim amendment, "the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by the amendment." *Warner–Jenkinson Co. v. Hilton–Davis Chem. Co.*, 520 U.S. 17, 33, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). In such a circumstance, prosecution history estoppel bars the application of the doctrine of equivalents with respect to that limitation. *See id.* Excel argues that Glaxo has failed to proffer an explanation for the

### (A). Independent Claims 14–15

Glaxo argues that the amendment to claims 14 and 15 did not serve to narrow the scope of the claims. In support of this argument, Glaxo contends that the claims, as originally written, contained a limitation with respect to shelf life of the product.[20] The amendment, which Glaxo contends added the HPMC limitation, also deleted the limitation relating to shelf life. Because shelf life and sustained release are two different limitations within the claims, Glaxo contends that the amendment did not narrow the claim, but merely substituted a new limitation, HPMC, into the claim. (Pl.'s Mem. Opposing Def.'s Mot. Summ. J. at 17–19.)

The fact that the controlled sustained release limitation and the shelf life limitation are unrelated does not support the conclusion urged by Glaxo. Prior to the amendment, claims 14–15 contained the following language: "A controlled sustained release tablet comprising an admixture ... of bupropion hydrochloride." (Brief Supp. Def.'s Mot. Summ. J., Ex. B.) Reading these claims in view of the specification, *see Markman*, 52 F.3d at 979, it is clear that the usage of "admixture" within these claims contemplates a compound blended with bupropion hydrochloride to achieve controlled sustained release of the active drug. (*e.g.*, Specification 1:67–2:3.) Thus, contrary to Glaxo's argument, original claims 14–15 did provide a limitation with respect to controlling the release rate of bupropion hydrochloride. Indeed, the limitation as originally written was quite broad. By failing to specify a mechanism in the claims to control the release rate of bupropion hydrochloride, the claims potentially encompassed *any* mechanisms that might be used to achieve this property.

In rejecting these claims, the examiner expressly rejected such a broadly written limitation: "While other excipients have been disclosed, the particular cellulose is considered critical for controlled and/or sustained release and should be incorporated into the independent claims. The disclosure of a single species does not provide a basis for claiming a generic concept." (Brief Supp. Def.'s Mot. Summ. J., Ex. C.) When the patentee rewrote the claims to include HPMC, the amendment narrowed the scope of these claims from claiming a generic concept, sustained release of bupropion hydrochloride into the bloodstream, to a "single species" of polymer to accomplish this property: HPMC. *See, e.g., Festo Corp.*, —— U.S. at ——, 122 S.Ct. at 1838 ("While the patentee has the right to appeal [an examiner's rejection], his decision to forego an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim."). Thus, the amendment to claims 14–15 served to narrow the scope of those claims. Moreover, because this amendment was made to satisfy the requirements of 35 U.S.C. § 112, ¶ 1, the claims were narrowed for a reason related to patentability. *See Festo Corp.*, —— U.S. at ——, 122 S.Ct. at 1839 ("[A] narrowing amendment made to satisfy any requirement of the Patent Act [including § 112] may give rise to an estoppel.").

amendments to claims 14–15 and 18–19 and, therefore, the holding in *Warner–Jenkinson* bars Glaxo from pursuing *any* range of equivalents with respect to the HPMC limitation within these claims. (Resp. Brief Supp. Def.'s Mot. Summ. J. at 7–8, 9–11.) Yet, the prosecution history for claims 14–15 and 18–19

provides ample explanation as to why the patentee amended the claims and the court concludes that the holding in *Warner–Jenkinson* has no application to the facts of this case.

**20.** *See supra* note 16.

### (B). Independent Claims 18–19

Glaxo argues that claims 18 and 19, which were originally written in "means plus function" form, were not narrowed when the applicant amended these claims to recite HPMC. According to Glaxo, the amendments "did nothing more than make explicit what had been implicit in the claim[s] as originally written." (Pl.'s Mem. Opp. Mot. Summ. J. at 20) (quoting *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d at 1377–78 (Fed.Cir.2001)). Much of Glaxo's argument focuses on pre-*Festo* precedent to support this assertion. (Pl.'s Mem. Opp. Mot. Summ. J. at 19–21.) Yet, contrary to Glaxo's assertion, the amendment of claims 18–19 from "means plus function" language to the recitation of HPMC narrowed the literal scope of the claims. *See Festo Corp.,* 234 F.3d at 589 ("[A] claim amendment that replaces means-plus-function language with language reciting the corresponding structure narrows the literal scope of the claim."). Moreover, as with claims 14–15, this amendment was made to satisfy the requirements of 35 U.S.C. § 112, and, therefore, the amendment was "made for a reason related to patentability." *Id.*[21]

### ii. Glaxo's Burden

■ Because the patentee narrowed claims 14–15 and 18–19 for reasons relating to patentability, Glaxo bears the burden to demonstrate that the amendments did not surrender the alleged equivalent in Excel's ANDA, PVA. *See Festo Corp.,* —— U.S. at ——, 122 S.Ct. at 1842. To meet its burden, Glaxo "must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Id.* On June 17, 2002, Glaxo filed a supplemental brief addressing this issue.

In its supplemental brief, Glaxo argues that PVA was not listed in the original patent application and, therefore, the patentee did not surrender PVA when claims 14–15 and 18–19 were amended. (Pl.'s Supp. Brief at 6–7.) Moreover, Glaxo contends that PVA's use in combination with bupropion hydrochloride was unforeseeable at the time of the claim amendments and, therefore, it was impossible for one skilled in the art to have drafted a claim that would have literally encompassed PVA. (*Id.* at 1–5, 7–9 & Ex. 1, Lowman Decl. ¶¶ 5–7.) For the purpose of this motion for summary judgment, the court assumes the truth of Glaxo's assertions with regard of the state of technology at the time of the claim amendments. Even assuming the truth of these assertions, however, Glaxo fails to meet its burden under *Festo.*

As discussed above, claims 14–15 and 18–19 as originally written potentially encompassed *any* excipient that could be blended with bupropion hydrochloride to produce a sustained release tablet.[22] Had these claims been accepted by the examiner, they also would have encompassed later-discovered excipients that could be blended into an admixture with bupropion

---

**21.** The patent applicant initially declined to amend claims 18–19 from the "means plus function" language and the examiner subsequently conducted a phone interview with the applicant regarding these claims. The examiner's notes indicate that the parties "[d]iscussed amending claims 17–19 to more clearly define the invention." (Brief Supp. Def.'s Mot. Summ. J., Ex. F.) Arguably, this indicates that the examiner's concern involved § 112, ¶ 2. Yet, regardless of whether the amendment was made to satisfy the requirements of ¶ 1 or ¶ 2, the amendment was made for a reason related to patentability. *See Festo Corp.,* —— U.S. at ——–——, 122 S.Ct. at 1839–40.

**22.** *See supra* notes 16–17.

hydrochloride. When the examiner rejected the claims, the patentee had every incentive to redraft the claims as broadly as possible in an effort surrender no more subject matter than necessary to secure its patent. For example, the patentee could have redrafted the claims to specify a category of polymers used to achieve sustained release, rather than list a specific polymer, HPMC, to achieve this property.[23]

As Glaxo concedes in its supplemental brief, there are numerous mechanisms that may be used to slow or impede the release rate of an active drug into the bloodstream. (Pl.'s Supp. Brief at 8–9.) These mechanisms include hydrogel-forming polymers and osmotic pump mechanisms, as well as other categories and hybrid-categories of polymers. (*Id.*) HPMC is a hydrogel-forming polymer. (*Id.*, Ex. 1., Lowman Decl. ¶¶ 3–4.) The fact that the patentee included HPMC into the patent claims confirms that scientific knowledge of this category of polymers existed at the time of the claim amendments. Thus, when redrafting claims 14–15 and 18–19, the patentee could have attempted to claim all hydrogel-forming polymers as the mechanism to control the release rate of bupropion hydrochloride, rather than claim only HPMC.

This more broadly drafted limitation would also have encompassed yet-to-be discovered hydrogel-forming polymers. Because PVA, like HPMC, is a hydrogel-forming polymer, the redrafted claims would have literally encompassed PVA. For this reason, the court concludes that at the time of the claim amendments, one skilled in the art could have reasonably drafted the claims to encompass PVA;

therefore, Glaxo is unable to meet its burden under *Festo*. Accordingly, Glaxo is barred from asserting the doctrine of equivalents with respect to claims 14–15, and 18–19. *See Festo Corp.,* — U.S. at ——, 122 S.Ct. at 1842.

■ When prosecution history estoppel bars a patentee from claiming equivalent infringement with respect to a claim limitation, the bar extends to all claims in which the limitation appears, regardless of whether the claims were amended during prosecution. *See, e.g., Intermatic Inc. v. Lamson & Sessions Co.,* 273 F.3d 1355, 1366–67 (Fed.Cir.2001) ("Any estoppel generated by [a narrowing] amendment applies to all other claims in the patent containing that limitation."); *American Permahedge, Inc. v. Barcana, Inc.,* 105 F.3d 1441, 1446 (Fed.Cir.1997) ("[U]nder the doctrine of equivalents, we see no reason to assign different ranges of equivalents for the identical term used in different claims in the same patent, absent an unmistakable indication to the contrary."). Thus, prosecution history estoppel bars Glaxo from asserting that PVA is equivalent to the HPMC limitation in all other claims containing that limitation. Accordingly, the court GRANTS summary judgment to Excel on the issue of equivalent infringement.

### *IV. Conclusion*

Because Excel's ANDA does not literally infringe upon the '798 patent, and prosecution history estoppel bars Glaxo from claiming equivalent infringement, Excel's motion for summary judgment of non-infringement is GRANTED. The Clerk is

---

**23.** Based on the examiner's statements in rejecting the original claims, it is unlikely that the patentee could have redrafted the claims any more broadly than they were. However, the issue before this court is whether the patentee had the scientific ability to redraft the claims more broadly, not whether the examiner would have accepted the hypothetical amendments.

DIRECTED to enter judgment for defendant.

The Clerk is DIRECTED to send copies of this Opinion to counsel for plaintiff and defendant.

IT IS SO ORDERED.