FESTO CORP. *v.* SHOKETSU KINZOKU KOGYO KABUSHIKI CO., LTD., ET AL.

No. 00–1543.   Argued January 8, 2002—Decided May 28, 2002

724

Robert H. Bork argued the cause for petitioner. With him on the briefs were *Charles R. Hoffmann, Gerald T. Bodner, Glenn T. Henneberger, Anthony E. Bennett, Andrew L. Frey, Donald M. Falk,* and *Robert L. Bronston.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae.* With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Schiffer, Jeffrey P. Minear, Vito J. DiPietro, Anthony J. Steinmeyer, Howard S. Scher,* and *Linda Moncys Isacson.*

*Arthur I. Neustadt* argued the cause for respondents. With him on the brief were *Charles L. Gholz, Robert T. Pous,* and *James B. Lampert.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Bar Association by *Robert E. Hirshon, E. Anthony Figg, Minaksi Bhatt,* and *Robert H. Cameron;* for the American Intellectual Property Law Association by *Lawrence M. Sung* and *Janice M. Mueller;* for ASTA Medica

JUSTICE KENNEDY delivered the opinion of the Court.

This case requires us to address once again the relation between two patent law concepts, the doctrine of equivalents and the rule of prosecution history estoppel. The Court considered the same concepts in *Warner-Jenkinson Co.* v. *Hilton Davis Chemical Co.*, 520 U. S. 17 (1997), and reaf-

Aktiengesellschaft by *Steven B. Kelber;* for Bose Corp. by *Charles Hieken* and *Frank P. Porcelli;* for Celltech Group plc. by *Donald S. Chisum;* for Chiron Corp. by *Mr. Chisum;* for the Federal Circuit Bar Association by *Claire Laporte, Mitchell J. Matorin,* and *George E. Hutchinson;* for Fédération Internationale des Conseils en Propriété Industrielle by *Maxim H. Waldbaum, Raymond C. Stewart, John P. Sutton,* and *Tipton D. Jennings IV;* for the Houston Intellectual Property Law Association by *Sharon A. Israel;* for Intellectual Property Creators et al. by *Steven L. Winter;* for Litton Systems, Inc., by *John G. Roberts, Jr., Catherine E. Stetson, Rory J. Radding,* and *Stanton T. Lawrence III;* for the Minnesota Mining and Manufacturing Co. et al. by *Carter G. Phillips, Joseph R. Guerra, Mark E. Haddad, Gary L. Griswold, Robert A. Armitage, Philip S. Johnson, Wayne C. Jaeschke, Peter C. Richardson,* and *Kenneth Olson;* for the National Bar Association by *Edward W. Gray, Jr., Kendrew H. Colton,* and *John Moses;* for the National Intellectual Property Law Institute by *James Phillip Chandler;* for the Wisconsin Alumni Research Foundation et al. by *Susan G. Braden, Kevin M. O'Brien,* and *Michael E. Murphy;* and for Vincent P. Tassinari by *Mr. Tassinari,* pro se.

Briefs of *amici curiae* urging affirmance were filed for the Consumer Project on Technology by *Joshua D. Sarnoff;* for Genentech, Inc., by *Jeffrey P. Kushan* and *Marinn F. Carlson;* for Intel Corp. et al. by *Terry E. Fenzl, Alan H. Blankenheimer,* and *Howard Ross Cabot;* and for International Business Machines Corp. et al. by *Christopher A. Hughes, Mark J. Abate, Frederick T. Boehm, Mark F. Chadurjian, William J. Coughlin, Barry Estrin,* and *Richard Whiting.*

Briefs of *amici curiae* were filed for Applera Corp. et al. by *Matthew D. Powers* and *Edward R. Reines;* for the Institute of Electrical and Electronics Engineers-United States of America by *Andrew C. Greenberg* and *Matthew J. Conigliaro;* for Medimmune, Inc., by *Harvey Kurzweil* and *Henry J. Ricardo;* for the Patent, Trademark, & Copyright Section of the Bar Association of the District of Columbia by *William P. Atkins;* for the Philadelphia Intellectual Property Law Association by *Joan Taft Kluger* and *Manny D. Pokotilow;* and for Sean Patrick Suiter by *Mr. Suiter,* pro se.

firmed that a patent protects its holder against efforts of copyists to evade liability for infringement by making only insubstantial changes to a patented invention. At the same time, we appreciated that by extending protection beyond the literal terms in a patent the doctrine of equivalents can create substantial uncertainty about where the patent monopoly ends. *Id.*, at 29. If the range of equivalents is unclear, competitors may be unable to determine what is a permitted alternative to a patented invention and what is an infringing equivalent.

To reduce the uncertainty, *Warner-Jenkinson* acknowledged that competitors may rely on the prosecution history, the public record of the patent proceedings. In some cases the Patent and Trademark Office (PTO) may have rejected an earlier version of the patent application on the ground that a claim does not meet a statutory requirement for patentability. 35 U. S. C. § 132 (1994 ed., Supp. V). When the patentee responds to the rejection by narrowing his claims, this prosecution history estops him from later arguing that the subject matter covered by the original, broader claim was nothing more than an equivalent. Competitors may rely on the estoppel to ensure that their own devices will not be found to infringe by equivalence.

In the decision now under review the Court of Appeals for the Federal Circuit held that by narrowing a claim to obtain a patent, the patentee surrenders all equivalents to the amended claim element. Petitioner asserts this holding departs from past precedent in two respects. First, it applies estoppel to every amendment made to satisfy the requirements of the Patent Act and not just to amendments made to avoid pre-emption by an earlier invention, *i. e.*, the prior art. Second, it holds that when estoppel arises, it bars suit against every equivalent to the amended claim element. The Court of Appeals acknowledged that this holding departed from its own cases, which applied a flexible bar when considering what claims of equivalence were estopped by the

prosecution history. Petitioner argues that by replacing the flexible bar with a complete bar the Court of Appeals cast doubt on many existing patents that were amended during the application process when the law, as it then stood, did not apply so rigorous a standard.

We granted certiorari to consider these questions.

I

Petitioner Festo Corporation owns two patents for an improved magnetic rodless cylinder, a piston-driven device that relies on magnets to move objects in a conveying system. The device has many industrial uses and has been employed in machinery as diverse as sewing equipment and the Thunder Mountain ride at Disney World. Although the precise details of the cylinder's operation are not essential here, the prosecution history must be considered.

Petitioner's patent applications, as often occurs, were amended during the prosecution proceedings. The application for the first patent, the Stoll Patent (U. S. Patent No. 4,354,125), was amended after the patent examiner rejected the initial application because the exact method of operation was unclear and some claims were made in an impermissible way. (They were multiply dependent.) 35 U. S. C. § 112 (1994 ed.). The inventor, Dr. Stoll, submitted a new application designed to meet the examiner's objections and also added certain references to prior art. 37 CFR § 1.56 (2000). The second patent, the Carroll Patent (U. S. Patent No. 3,779,401), was also amended during a reexamination proceeding. The prior art references were added to this amended application as well. Both amended patents added a new limitation—that the inventions contain a pair of sealing rings, each having a lip on one side, which would prevent impurities from getting on the piston assembly. The amended Stoll Patent added the further limitation that the outer shell of the device, the sleeve, be made of a magnetizable material.

After Festo began selling its rodless cylinder, respondents (whom we refer to as SMC) entered the market with a device similar, but not identical, to the ones disclosed by Festo's patents. SMC's cylinder, rather than using two one-way sealing rings, employs a single sealing ring with a two-way lip. Furthermore, SMC's sleeve is made of a nonmagnetizable alloy. SMC's device does not fall within the literal claims of either patent, but petitioner contends that it is so similar that it infringes under the doctrine of equivalents.

SMC contends that Festo is estopped from making this argument because of the prosecution history of its patents. The sealing rings and the magnetized alloy in the Festo product were both disclosed for the first time in the amended applications. In SMC's view, these amendments narrowed the earlier applications, surrendering alternatives that are the very points of difference in the competing devices—the sealing rings and the type of alloy used to make the sleeve. As Festo narrowed its claims in these ways in order to obtain the patents, says SMC, Festo is now estopped from saying that these features are immaterial and that SMC's device is an equivalent of its own.

The United States District Court for the District of Massachusetts disagreed. It held that Festo's amendments were not made to avoid prior art, and therefore the amendments were not the kind that give rise to estoppel. A panel of the Court of Appeals for the Federal Circuit affirmed. 72 F. 3d 857 (1995). We granted certiorari, vacated, and remanded in light of our intervening decision in *Warner-Jenkinson Co.* v. *Hilton Davis Chemical Co.,* 520 U. S. 17 (1997). After a decision by the original panel on remand, 172 F. 3d 1361 (1999), the Court of Appeals ordered rehearing en banc to address questions that had divided its judges since our decision in *Warner-Jenkinson.* 187 F. 3d 1381 (1999).

The en banc court reversed, holding that prosecution history estoppel barred Festo from asserting that the accused device infringed its patents under the doctrine of equiva-

lents. 234 F. 3d 558 (2000). The court held, with only one judge dissenting, that estoppel arises from any amendment that narrows a claim to comply with the Patent Act, not only from amendments made to avoid prior art. *Id.*, at 566. More controversial in the Court of Appeals was its further holding: When estoppel applies, it stands as a complete bar against any claim of equivalence for the element that was amended. *Id.*, at 574–575. The court acknowledged that its own prior case law did not go so far. Previous decisions had held that prosecution history estoppel constituted a flexible bar, foreclosing some, but not all, claims of equivalence, depending on the purpose of the amendment and the alterations in the text. The court concluded, however, that its precedents applying the flexible-bar rule should be overruled because this case-by-case approach has proved unworkable. In the court's view a complete-bar rule, under which estoppel bars all claims of equivalence to the narrowed element, would promote certainty in the determination of infringement cases.

Four judges dissented from the decision to adopt a complete bar. *Id.*, at 562. In four separate opinions, the dissenters argued that the majority's decision to overrule precedent was contrary to *Warner-Jenkinson* and would unsettle the expectations of many existing patentees. Judge Michel, in his dissent, described in detail how the complete bar required the Court of Appeals to disregard 8 older decisions of this Court, as well as more than 50 of its own cases. 234 F. 3d, at 601–616.

We granted certiorari. 533 U. S. 915 (2001).

## II

The patent laws "promote the Progress of Science and useful Arts" by rewarding innovation with a temporary monopoly. U. S. Const., Art. I, § 8, cl. 8. The monopoly is a property right; and like any property right, its boundaries should be clear. This clarity is essential to promote progress, be-

cause it enables efficient investment in innovation. A patent holder should know what he owns, and the public should know what he does not. For this reason, the patent laws require inventors to describe their work in "full, clear, concise, and exact terms," 35 U. S. C. § 112, as part of the delicate balance the law attempts to maintain between inventors, who rely on the promise of the law to bring the invention forth, and the public, which should be encouraged to pursue innovations, creations, and new ideas beyond the inventor's exclusive rights. *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 150 (1989).

Unfortunately, the nature of language makes it impossible to capture the essence of a thing in a patent application. The inventor who chooses to patent an invention and disclose it to the public, rather than exploit it in secret, bears the risk that others will devote their efforts toward exploiting the limits of the patent's language:

> "An invention exists most importantly as a tangible structure or a series of drawings. A verbal portrayal is usually an afterthought written to satisfy the requirements of patent law. This conversion of machine to words allows for unintended idea gaps which cannot be satisfactorily filled. Often the invention is novel and words do not exist to describe it. The dictionary does not always keep abreast of the inventor. It cannot. Things are not made for the sake of words, but words for things." *Autogiro Co. of America* v. *United States*, 384 F. 2d 391, 397 (Ct. Cl. 1967).

The language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be destroyed by simple acts of copying. For this

reason, the clearest rule of patent interpretation, literalism, may conserve judicial resources but is not necessarily the most efficient rule. The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described. See *Winans* v. *Denmead*, 15 How. 330, 347 (1854).

It is true that the doctrine of equivalents renders the scope of patents less certain. It may be difficult to determine what is, or is not, an equivalent to a particular element of an invention. If competitors cannot be certain about a patent's extent, they may be deterred from engaging in legitimate manufactures outside its limits, or they may invest by mistake in competing products that the patent secures. In addition the uncertainty may lead to wasteful litigation between competitors, suits that a rule of literalism might avoid. These concerns with the doctrine of equivalents, however, are not new. Each time the Court has considered the doctrine, it has acknowledged this uncertainty as the price of ensuring the appropriate incentives for innovation, and it has affirmed the doctrine over dissents that urged a more certain rule. When the Court in *Winans* v. *Denmead, supra,* first adopted what has become the doctrine of equivalents, it stated that "[t]he exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, varying its form or proportions." *Id.,* at 343. The dissent argued that the Court had sacrificed the objective of "[f]ul[l]ness, clearness, exactness, preciseness, and particularity, in the description of the invention." *Id.,* at 347 (opinion of Campbell, J.).

The debate continued in *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 339 U. S. 605 (1950), where the Court reaffirmed the doctrine. *Graver Tank* held that patent claims must protect the inventor not only from those who produce devices falling within the literal claims of the patent but also from copyists who "make unimportant and insubstantial changes and substitutions in the patent which, though adding

nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Id.*, at 607. Justice Black, in dissent, objected that under the doctrine of equivalents a competitor "cannot rely on what the language of a patent claims. He must be able, at the peril of heavy infringement damages, to forecast how far a court relatively unversed in a particular technological field will expand the claim's language . . . ." *Id.*, at 617.

Most recently, in *Warner-Jenkinson,* the Court reaffirmed that equivalents remain a firmly entrenched part of the settled rights protected by the patent. A unanimous opinion concluded that if the doctrine is to be discarded, it is Congress and not the Court that should do so:

> "[T]he lengthy history of the doctrine of equivalents strongly supports adherence to our refusal in *Graver Tank* to find that the Patent Act conflicts with that doctrine. Congress can legislate the doctrine of equivalents out of existence any time it chooses. The various policy arguments now made by both sides are thus best addressed to Congress, not this Court." 520 U. S., at 28.

### III

Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process. Estoppel is a "rule of patent construction" that ensures that claims are interpreted by reference to those "that have been cancelled or rejected." *Schriber-Schroth Co.* v. *Cleveland Trust Co.*, 311 U. S. 211, 220–221 (1940). The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes. When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory com-

prised unforeseen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, "[b]y the amendment [the patentee] recognized and emphasized the difference between the two phrases[,] . . . and [t]he difference which [the patentee] thus disclaimed must be regarded as material." *Exhibit Supply Co.* v. *Ace Patents Corp.*, 315 U. S. 126, 136–137 (1942).

A rejection indicates that the patent examiner does not believe the original claim could be patented. While the patentee has the right to appeal, his decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim. See *Goodyear Dental Vulcanite Co.* v. *Davis*, 102 U. S. 222, 228 (1880) ("In view of [the amendment] there can be no doubt of what [the patentee] understood he had patented, and that both he and the commissioner regarded the patent to be for a manufacture made exclusively of vulcanites by the detailed process"); *Wang Laboratories, Inc.* v. *Mitsubishi Electronics America, Inc.*, 103 F. 3d 1571, 1577–1578 (CA Fed. 1997) ("Prosecution history estoppel . . . preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent"). Were it otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an infringement action the very subject matter surrendered as a condition of receiving the patent.

Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose. Where the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question. The doctrine of equivalents is premised on language's inability to capture the essence of innovation, but a prior application describing the precise element at issue undercuts that premise. In that instance the prosecution history has

established that the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter.

## A

The first question in this case concerns the kinds of amendments that may give rise to estoppel. Petitioner argues that estoppel should arise when amendments are intended to narrow the subject matter of the patented invention, for instance, amendments to avoid prior art, but not when the amendments are made to comply with requirements concerning the form of the patent application. In *Warner-Jenkinson* we recognized that prosecution history estoppel does not arise in every instance when a patent application is amended. Our "prior cases have consistently applied prosecution history estoppel only where claims have been amended for a limited set of reasons," such as "to avoid the prior art, or otherwise to address a specific concern—such as obviousness—that arguably would have rendered the claimed subject matter unpatentable." 520 U. S., at 30–32. While we made clear that estoppel applies to amendments made for a "substantial reason related to patentability," *id.*, at 33, we did not purport to define that term or to catalog every reason that might raise an estoppel. Indeed, we stated that even if the amendment's purpose were unrelated to patentability, the court might consider whether it was the kind of reason that nonetheless might require resort to the estoppel doctrine. *Id.*, at 40–41.

Petitioner is correct that estoppel has been discussed most often in the context of amendments made to avoid the prior art. See *Exhibit Supply Co.*, *supra*, at 137; *Keystone Driller Co.* v. *Northwest Engineering Corp.*, 294 U. S. 42, 48 (1935). Amendment to accommodate prior art was the emphasis, too, of our decision in *Warner-Jenkinson, supra*, at 30. It does not follow, however, that amendments for other purposes will not give rise to estoppel. Prosecution

history may rebut the inference that a thing not described was indescribable. That rationale does not cease simply because the narrowing amendment, submitted to secure a patent, was for some purpose other than avoiding prior art.

We agree with the Court of Appeals that a narrowing amendment made to satisfy any requirement of the Patent Act may give rise to an estoppel. As that court explained, a number of statutory requirements must be satisfied before a patent can issue. The claimed subject matter must be useful, novel, and not obvious. 35 U. S. C. §§ 101–103 (1994 ed. and Supp. V). In addition, the patent application must describe, enable, and set forth the best mode of carrying out the invention. § 112 (1994 ed.). These latter requirements must be satisfied before issuance of the patent, for exclusive patent rights are given in exchange for disclosing the invention to the public. See *Bonito Boats,* 489 U. S., at 150–151. What is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue. The patent also should not issue if the other requirements of § 112 are not satisfied, and an applicant's failure to meet these requirements could lead to the issued patent being held invalid in later litigation.

Petitioner contends that amendments made to comply with § 112 concern the form of the application and not the subject matter of the invention. The PTO might require the applicant to clarify an ambiguous term, to improve the translation of a foreign word, or to rewrite a dependent claim as an independent one. In these cases, petitioner argues, the applicant has no intention of surrendering subject matter and should not be estopped from challenging equivalent devices. While this may be true in some cases, petitioner's argument conflates the patentee's reason for making the amendment with the impact the amendment has on the subject matter.

Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope. If a § 112 amendment is truly cosmetic, then it would not narrow

the patent's scope or raise an estoppel. On the other hand, if a § 112 amendment is necessary and narrows the patent's scope—even if only for the purpose of better description— estoppel may apply. A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112. We must regard the patentee as having conceded an inability to claim the broader subject matter or at least as having abandoned his right to appeal a rejection. In either case estoppel may apply.

### B

Petitioner concedes that the limitations at issue—the sealing rings and the composition of the sleeve—were made for reasons related to § 112, if not also to avoid the prior art. Our conclusion that prosecution history estoppel arises when a claim is narrowed to comply with § 112 gives rise to the second question presented: Does the estoppel bar the inventor from asserting infringement against any equivalent to the narrowed element or might some equivalents still infringe? The Court of Appeals held that prosecution history estoppel is a complete bar, and so the narrowed element must be limited to its strict literal terms. Based upon its experience the Court of Appeals decided that the flexible-bar rule is unworkable because it leads to excessive uncertainty and burdens legitimate innovation. For the reasons that follow, we disagree with the decision to adopt the complete bar.

Though prosecution history estoppel can bar a patentee from challenging a wide range of alleged equivalents made or distributed by competitors, its reach requires an examination of the subject matter surrendered by the narrowing amendment. The complete bar avoids this inquiry by establishing a *per se* rule; but that approach is inconsistent with the purpose of applying the estoppel in the first place—to hold the inventor to the representations made during the application process and to the inferences that may reason-

ably be drawn from the amendment. By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claim. It does not follow, however, that the amended claim becomes so perfect in its description that no one could devise an equivalent. After amendment, as before, language remains an imperfect fit for invention. The narrowing amendment may demonstrate what the claim is not; but it may still fail to capture precisely what the claim is. There is no reason why a narrowing amendment should be deemed to relinquish equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered. Nor is there any call to foreclose claims of equivalence for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted. The amendment does not show that the inventor suddenly had more foresight in the drafting of claims than an inventor whose application was granted without amendments having been submitted. It shows only that he was familiar with the broader text and with the difference between the two. As a result, there is no more reason for holding the patentee to the literal terms of an amended claim than there is for abolishing the doctrine of equivalents altogether and holding every patentee to the literal terms of the patent.

This view of prosecution history estoppel is consistent with our precedents and respectful of the real practice before the PTO. While this Court has not weighed the merits of the complete bar against the flexible bar in its prior cases, we have consistently applied the doctrine in a flexible way, not a rigid one. We have considered what equivalents were surrendered during the prosecution of the patent, rather than imposing a complete bar that resorts to the very literalism the equivalents rule is designed to overcome. *E. g.,* *Goodyear Dental Vulcanite Co.,* 102 U. S., at 230; *Hurlbut* v. *Schillinger,* 130 U. S. 456, 465 (1889).

The Court of Appeals ignored the guidance of *Warner-Jenkinson*, which instructed that courts must be cautious before adopting changes that disrupt the settled expectations of the inventing community. See 520 U. S., at 28. In that case we made it clear that the doctrine of equivalents and the rule of prosecution history estoppel are settled law. The responsibility for changing them rests with Congress. *Ibid.* Fundamental alterations in these rules risk destroying the legitimate expectations of inventors in their property. The petitioner in *Warner-Jenkinson* requested another bright-line rule that would have provided more certainty in determining when estoppel applies but at the cost of disrupting the expectations of countless existing patent holders. We rejected that approach: "To change so substantially the rules of the game now could very well subvert the various balances the PTO sought to strike when issuing the numerous patents which have not yet expired and which would be affected by our decision." *Id.*, at 32, n. 6; see also *id.*, at 41 (GINSBURG, J., concurring) ("The new presumption, if applied woodenly, might in some instances unfairly discount the expectations of a patentee who had no notice at the time of patent prosecution that such a presumption would apply"). As *Warner-Jenkinson* recognized, patent prosecution occurs in the light of our case law. Inventors who amended their claims under the previous regime had no reason to believe they were conceding all equivalents. If they had known, they might have appealed the rejection instead. There is no justification for applying a new and more robust estoppel to those who relied on prior doctrine.

In *Warner-Jenkinson* we struck the appropriate balance by placing the burden on the patentee to show that an amendment was not for purposes of patentability:

"Where no explanation is established, however, the court should presume that the patent application had a substantial reason related to patentability for including the limiting element added by amendment. In those

circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element." *Id.*, at 33.

When the patentee is unable to explain the reason for amendment, estoppel not only applies but also "bar[s] the application of the doctrine of equivalents as to that element." *Ibid.* These words do not mandate a complete bar; they are limited to the circumstance where "no explanation is established." They do provide, however, that when the court is unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language.

Just as *Warner-Jenkinson* held that the patentee bears the burden of proving that an amendment was not made for a reason that would give rise to estoppel, we hold here that the patentee should bear the burden of showing that the amendment does not surrender the particular equivalent in question. This is the approach advocated by the United States, see Brief for United States as *Amicus Curiae* 22–28, and we regard it to be sound. The patentee, as the author of the claim language, may be expected to draft claims encompassing readily known equivalents. A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim. *Exhibit Supply,* 315 U. S., at 136–137 ("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference"). There are some cases, however, where the amendment cannot reasonably be viewed as surrendering a particular equivalent. The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there

may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question. In those cases the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence.

This presumption is not, then, just the complete bar by another name. Rather, it reflects the fact that the interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims. When the patentee has chosen to narrow a claim, courts may presume the amended text was composed with awareness of this rule and that the territory surrendered is not an equivalent of the territory claimed. In those instances, however, the patentee still might rebut the presumption that estoppel bars a claim of equivalence. The patentee must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.

## IV

On the record before us, we cannot say petitioner has rebutted the presumptions that estoppel applies and that the equivalents at issue have been surrendered. Petitioner concedes that the limitations at issue—the sealing rings and the composition of the sleeve—were made in response to a rejection for reasons under § 112, if not also because of the prior art references. As the amendments were made for a reason relating to patentability, the question is not whether estoppel applies but what territory the amendments surrendered. While estoppel does not effect a complete bar, the question remains whether petitioner can demonstrate that the narrowing amendments did not surrender the particular equivalents at issue. On these questions, SMC may well prevail, for the sealing rings and the composition of the sleeve both were noted expressly in the prosecution history. These matters, however, should be determined in the first instance

by further proceedings in the Court of Appeals or the District Court.

The judgment of the Federal Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*