Dissenting opinion filed by Chief Judge PROST.
STOLL, Circuit Judge.
The International Trade Commission found the claim term “virtually free from interference” indefinite and invalidated the asserted claims of One-E-Way’s patents. Because we conclude that the term “virtually free from interference,” as properly interpreted in light of the specification and prosecution history, would inform a person of ordinary skill in the art about the scope of the invention with reasonable certainty, we reverse.
Background
I.
One-E-Way filed a complaint with the International Trade Commission accusing, among others, Respondents Sony Corporation; Sony Corporation of America; Sony Electronics, Inc.; BlueAnt Wireless Pty, Ltd.; BlueAnt Wireless, Inc.; Creative Technology Ltd.; Creative Labs, Inc.; and GN Netcom A/S (collectively, “Respondents”) of infringing two of its related patents, U.S. Patent Nos. 7,865,258 and 8,131,391. One-E-Way asserted, inter alia, claim 8 of the ’258 patent and claims 1, 3-6, and 10 of the ’391 patent.
II.
Both patents disclose a wireless digital audio system designed to let people use wireless headphones privately, without interference, even when multiple people are using wireless headphones in the same space. ’258 patent, Abstract.[1] The specifica *1061 tion explains that previous wireless digital audio systems did’ not, among other things, provide “private listening without interference where multiple users occupying the same space are operating wireless transmission devices.” Id. at col. 111. 15-49. The specification further explains that the prior art “audio systems ma[de] use of electrical wire connections between the audio source and the headphones to accomplish private listening to multiple users.” Id. at col. 111. 40-42.
The patents purport to solve these problems in the prior art by disclosing a digital wireless audio system that ensures private listening. Specifically, the patent specification proposes changing the way prior art systems sent and processed the wireless signal. It suggests sending a digitally encoded signal to ensure each user can independently access his or her transmission. Id. at col. 3 11. 16-18. It further suggests processing the signal with a fuzzy logic detection subsystem to enhance signal clarity. Id. at col. 3 11. 40-43, 56-59. These and other improvements enable a user “to listen (privately) to high fidelity audio music, using any of the audio devices listed previously, without the use of wires, and without interference from any other receiver headphone ... user, even when operated within a shared space.” Id. at col. 3 11. 28-32.
III.
At the Commission, the parties disputed whether the claim term “virtually free from interference” was indefinite. While the term is present in all the asserted claims, we reproduce claim 8 of the ’258 patent below as illustrative:
8. A portable wireless digital audio system for digital transmission of an original audio signal representation from a portable audio source to a digital audio headphone, said portable wireless digital audio system comprising:
a portable digital audio transmitter configured to couple to said portable audio source and transmitting a unique user code bit sequence with said original audio signal representation in packet format, said digital audio transmitter comprising:
an encoder operative to encode said original audio signal representation to reduce intersymbol interference; and a digital modulator configured for independent code division multiple access (CDMA) communication operation; and said portable digital audio transmitter configured for direct digital wireless communication with said digital audio headphone, said digital audio headphone comprising:
a direct conversion module configured to capture packets embedded in the received spread spectrum signal, the captured packets corresponding to the unique user code bit sequence;
a digital demodulator configured for independent CDMA communication operation;
a decoder operative to decode the applied reduced intersymbol interference coding of said original audio signal representation;
a digital-to-analog converter (DAC) generating an audio output of said original audio signal representation; and
a module adapted to reproduce said generated audio output, said audio having been wirelessly transmitted from said portable audio source virtually free from interference from device transmitted signals operating in the portable wireless digital audio system spectrum.
Id. at col. 7 1. 62-col. 8 1. 27 (emphasis added).
*1062 Respondents and the Commission’s Office of Unfair Import Investigation (“the Staff’) both asserted that “virtually free from interference” was indefinite. One-E-Way, to the contrary, proposed that the term meant “free from interference such that eavesdropping on device transmitted signals operating in the ... wireless digital audio system spectrum cannot occur.” J.A. 11454. As the administrative law judge explained, One-E-Way contended that “the specifications of the asserted patents provide ‘abundant guidance’ to one of ordinary skill in the art” to understand that “virtually free from interference” requires “that users of the invention do not hear each other’s transmissions.” J.A. 12927. The ALJ conducted a claim construction hearing and issued a decision finding “virtually free from interference” indefinite under 35 U.S.C. § 112. J.A. 12921-30.
Respondents filed a motion for summary determination that the term “virtually free from interference” is indefinite, which the ALJ granted. J.A. 6-93. The ALJ concluded that the “term ‘virtually free from interference’ is not defined in the Asserted Patents or their history” and does not “have an understood meaning in the relevant art.” J.A. 87. The ALJ explained that he found “virtually free from interference” to be indefinite because one of ordinary skill in the art had “no guidepost in the intrinsic or extrinsic evidence from which [she] could discern the scope of the limitation.” J.A. 88.
One-E-Way petitioned the Commission to review the ALJ’s summary-determination order. J.A. 2. The Commission agreed with the ALJ that “virtually free from interference” was indefinite. Id. The Commission thus affirmed the ALJ’s order.
One-E-Way appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(6).
Discussion
We review the Commission’s grant of summary determination de novo. Amgen, Inc. v. Int’l Trade Comm’n, 565 F.3d 846, 849 (Fed. Cir. 2009). “Indefiniteness is a question of law that we review de novo, subject to a determination of underlying facts.” Akzo Nobel Coatings, Inc. v. Dow Chem. Co., 811 F.3d 1334, 1343 (Fed. Cir. 2016) (internal citation omitted). We presume that patents are valid, so “[a]ny fact critical to a holding on indefiniteness ... must be proven by the challenger by clear and convincing evidence.” Cox Commc’ns, Inc. v. Sprint Commc’n Co. LP, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (alteration in original) (quoting Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1366 (Fed. Cir. 2003)); see also 35 U.S.C. § 282.
I.
The Patent Act requires inventors to claim their invention in “full, clear, concise, and exact terms.” 35 U.S.C. § 112. This indefiniteness requirement is “part of the delicate balance the law attempts to maintain between inventors, who rely on the promise of the law to bring the invention forth, and the public, which should be encouraged to pursue innovations, creations, and new ideas beyond the inventor’s exclusive rights.” Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 731, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). This balance recognizes that all claims suffer from “the inherent limitations of language,” but also that claims must “be precise enough to afford clear notice of what is claimed.” Nautilus, Inc. v. Biosig Instruments, Inc., — U.S. —, 134 S.Ct. 2120, 2128-29, 189 L.Ed.2d 37 (2014). This balance permits “[s]ome modicum of uncertainty” to “ensur[e] the appropriate incentives for innovation,” but it also provides a “meaningful definiteness check” to prevent patent applicants from *1063 “inject[ing] ambiguity into their claims.” Id. (internal quotations omitted). Recognizing this balance, the Supreme Court articulated the test for indefiniteness as “re-quir[ing] that a patent’s claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.” Id. at 2129. This test “man-dates clarity, while recognizing that absolute precision is unattainable.” Id.
As long as claim terms satisfy this test, relative terms and words of degree do not render patent claims invalid. Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1370 (Fed. Cir. 2014). To determine whether a particular term is indefinite, “[o]ne must bear in mind ... that patents are ‘not addressed to lawyers, or even to the public generally,’ but rather to those skilled in the relevant art.” Nautilus, 134 S.Ct. at 2128-29 & n.5 (quoting Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 437, 22 S.Ct. 698, 46 L.Ed. 968 (1902), and citing Eibel Process Co. v. Minn. & Ont. Paper Co., 261 U.S. 45, 58, 65-66, 43 S.Ct. 322, 67 L.Ed. 523 (1923)). For example, in 1923, the Supreme Court “uph[eld] as definite a patent for an improvement to a paper-making machine, which provided that a wire be placed at a ‘high’ or ‘substantial elevation.’ ” Nautilus, 134 S.Ct. at 2129 n.5 (citing Eibel Process, 261 U.S. at 58, 43 S.Ct. 322). The Court explained that these relative terms — “substantial” and “high” — were sufficiently definite because “ ‘readers ... skilled in the art of paper making and versed in the use of the ... machine’ would have ‘no difficulty ... in determining ... the substantial [elevation] needed’ for the machine to operate as specified.” Id. (quoting Eibel Process, 261 U.S. at 65-66, 43 S.Ct. 322).
This historical practice continues today. In one of our posk-Nautilus decisions, we upheld as definite a claim that employed the relative term “substantially centered.” Apple Inc. v. Samsung Elecs. Co., 786 F.3d 983, 1002 (Fed. Cir. 2015), rev’d and remanded on other grounds, — U.S. —, 137 S.Ct. 429, 196 L.Ed.2d 363 (2016). The claim term, used in a patent relating to a user-interface feature, required that a selected portion of an electronic display be enlarged and “substantially centered” on the display. Id. (quoting U.S. Patent No. 7,864, 163 (Claim 50)). The patent challenger had failed to adduce any evidence showing that the person of ordinary skill would lack reasonable certainty in the claim’s scope, while the patent owner had presented expert testimony that skilled artisans would interpret “substantially centered” in the patent “to mean essentially centered except for a marginal spacing to accommodate ancillary graphical user interface elements.” Id. at 1003. Moreover, the expert’s suggested interpretation of “substantially centered” paralleled the patent specification’s disclosure. Id. Relying on these disclosures, the court concluded that “substantially centered” was not indefinite. Id.
II.
Here, we must determine whether the term “virtually free from interference” is indefinite.[2] The Commission determined that the term is indefinite, and both the Government and Respondents urge affir-mance of that conclusion on appeal. One-E-Way proposes that the claim term, viewed in light of the specification and prosecution *1064 history, should be interpreted to mean “free from interference such that eavesdropping on device transmitted signals operating in the ... wireless digital audio system spectrum cannot occur.” J.A. 11454; Appellant Br. 13. Put simply, One-E-Way proposes that “virtually free from interference” prevents one user from eavesdropping on another. We agree.
A.
First, the claims require that the system user’s audio is “virtually free from interference” from signals transmitted by other users’ wireless audio transmission devices. For example, claim 8 of the '258 patent requires a “digital audio system comprising ... a module adapted to reproduce ... generated audio output, said audio having been wirelessly transmitted from said portable audio source virtually free from interference from device transmitted signals operating in the portable wireless digital audio system spectrum.” ’258 patent col. 7 1. 62-col. 8 1. 47 (Claim 8) (emphasis added). This claim requires that the headphone’s audio output be “virtually free from interference.” And the claim names the source of this interference: signals transmitted by other wireless audio transmission devices.
That the claims require a listener’s audio enjoyment to be “virtually free from interference” from other wireless-headphone listeners is not surprising, particularly in light of the specification’s disclosure. As explained above, the specification discloses a system that enables wireless headphone users to enjoy their audio privately, without interference.
The specification repeatedly highlights this private-listening feature of the claimed invention. And in each repetition, the spee-ifieation states that private listening is “without interference” from other users’ wireless audio transmission devices. For instance, the background of the invention emphasizes that the prior art needs a system like the one disclosed in the ’258 patent capable of “private listening without interference where multiple users occupying the same space are operating wireless transmission devices.” Id. at col. 1 11. 38-40. The summary of the invention touts the claimed invention as being capable of “private listening without interference from other users or wireless devices.” Id. at col. 1 11. 64-67. The detailed description additionally features an embodiment capable of private listening “without interference from any other receiver headphone ... user, even when operated within a shared space.” Id. at col. 3 11. 30-32. And the abstract underscores the patented system’s ability to deliver “private audio enjoyment without interference from other users of independent wireless digital transmitters and receivers sharing the same space.” Id. at Abstract.
Taken together, the specification makes clear that private listening is listening without interference from other users. In other words, the interference would cause one user to hear another user’s wireless transmissions, potentially interfering with the utility of a device. The patented invention sought to prevent such interference, making it possible for wireless-headphone users to listen in private. Id. at col. 1 11. 43^9.
B.
The prosecution history confirms One-E-Way’s interpretation of “virtually free from interference.” During prosecution of the related parent patent,[3] the applicant *1065 explained that the term “virtually free from interference” results in the ability to listen without eavesdropping:
As is agreed to by the Applicant and Examiner, most recently discussed during the teleconference with the Examiner on June 3, 2009, Lavelle [prior art] does not teach, disclose, or suggest such a relationship where interference is virtually eliminated (e.g. where eavesdropping cannot occur) where multiple receivers and transmitters occupy the same environment.
J.A. 15271 (emphasis added).
The parties dispute, however, the relevance of this statement in the prosecution history. The Government and Respondents assert that this prosecution history statement is irrelevant to the meaning of “virtually free from interference” because it was made by the applicant regarding claims reciting the term “free from interference,” rather than “virtually free from interference.” J.A. 15271 (discussing amendments to claims 24-27 in parent patent application 12/144,729). Because the prosecution history statement referred to “virtually free from interference” and the claims referred to “free from interference,” the ALJ found “it impossible to agree with Complainant that one of ordinary skill in the art would conclude that the applicant was providing guidance as to the meaning and scope of a different limitation (i.e., ‘virtually free from interference’).” J.A. 10.
We conclude, however, that the person of ordinary skill would have found this statement in the prosecution history instructive. First, the “free from interference” claims were not the only ones pending at the time applicants filed the response. Rather, there were other pending claims reciting “virtually free from interference,” namely already-allowed claims 12 and 16. J.A. 15296, 15329-31.
Moreover, the very language of the prosecution history statement employs the term “virtually.” The applicant stated that Lavelle does not teach that “interference is virtually eliminated (e.g. where eavesdropping cannot occur).” J.A. 15271. On its face, this statement suggests that interference, virtually eliminated, results in listening without eavesdropping. As noted above, this understanding is entirely consistent with the specification, which suggests that “free from interference” provides private listening. See ’258 patent col. 1 11. 64-67. This understanding is also consistent with the testimony of One-E-Way’s technical expert, who explained that “[t]he concept of a user not being able to eavesdrop on the device transmissions of another user is consistent with the purpose (‘private listening’) and the mechanisms-(separation of users by recognizing other transmissions as ‘noise’) disclosed in the patents.” J.A. 12922 (alteration in original) (ALJ’s order construing terms of the asserted patents and acknowledging expert testimony).
The context of the prosecution history does not man-date a different reading. The examiner had rejected the claims over La-velle. Lavelle, according to the applicant, did not disclose the claimed audio “free from interference.” That might have been enough for the applicant’s amendment to succeed, but the applicant appears to have made an even bolder claim, namely that Lavelle is not even “virtually free from interference,” let alone totally free. In other words, Lavelle does not meet the “free from interference” claim term because it *1066 does not disclose listening that is even virtually free.
C.
Respondents further argue that the term “virtually free from interference” does not “inform one of ordinary skill in the art as to any particular level of interference or as to how much interference is permitted.” Intervenors’ Br. 13. The ALJ similarly found that the term “is indefinite ... because one of ordinary skill in the art would not be able to discern with reasonable certainty what amount or level of interference constitutes ‘virtually free from interference.’ ” J.A. 12925 (ALJ’s order construing terms of the asserted patents). This finding was based in part on Respondents’ assertion “that there are known ways to define levels of interference in the ISM band, such as signal to noise ratios, packet errors and bit rate errors, but that the specifications give no examples or descriptions and have no relevant figures relating to levels of interference.” J.A. 12923 (ALJ’s summary of Respondents’ position).
While One-E-Way did not define the scope of the term “virtually free from interference” in a technical sense as both the ALJ and Respondents would seemingly require, the lack of a technical definition does not render the term indefinite. As demonstrated by the specification and prosecution history discussed above, the applicant used the term “interference” in a non-technical manner to simply mean that the wireless headphone user is able to listen without eavesdropping. This interpretation is consistent with the specification and prosecution history and provides a clear line such that it informs those skilled in the art about the scope of the invention with reasonable certainty. For the purposes of definiteness, the term is not required to have a technical measure of the amount of interference.
D.
Finally, we consider the Government and Respondent’s claim that “virtually free from interference” must be indefinite because One-E-Way fails to identify how it differs in scope from claims that recite the term “free from interference.”
At the outset, we note that One-E-Way has not asserted claims that recite the term “free from interference” here. The asserted claims recite only “virtually free from interference.” We are aware of no precedent requiring us to construe the “free from interference” term where, as here, the term is absent from any asserted claim.
Nevertheless, without deciding the meaning of the term “free from interference,” an understanding of the relative meaning of these terms is readily apparent. Both terms relate, of course, to the ultimate aim of the patented invention: providing private listening without interference from signals transmitted by other users’ wireless audio transmission devices. E.g., ’258 patent, Abstract. As we have explained, the claims, specification, and prosecution history show that “virtually free from interference” means the ability to listen without eavesdropping such that a user is not able to listen to another user’s transmissions in the wireless digital audio system spectrum. When the patented system works, the listener will, for example, hear only their music, but not that of others. The claims recite this listening-without-eavesdropping feature as audio “virtually free from interference.”
Audio “free from interference” will be a bit better than audio “virtually free from interference,” in the same way something “free from defects” will be a bit better than something “substantially” or “virtual *1067 ly free from defects.” It follows that one of ordinary skill might expect that because audio “virtually free from interference” is free from eavesdropping, audio “free from interference” will be, at a minimum, free from eavesdropping as well.
Conclusion
We conclude that a person of ordinary skill in the art, viewing the claim term “virtually free from interference” in light of the specification and prosecution history, would be informed of the scope of the invention with reasonable certainty. While we note that “virtually” is a term of degree, one that slightly expands the scope of the term “free from interference,” the inclusion of “virtually” in these claims does not render them indefinite. See Eibel Process, 261 U.S. at 58, 43 S.Ct. 322. The term “virtually” does not expand “free from interference” without end: it simply requires that the claimed invention does not allow for eavesdropping. A system that permits eavesdropping is no longer “free” or “virtually free from interference”; that system is no longer captured by the asserted patents’ claims. Thus, the term “virtually free from interference” satisfies the requirements of § 112 ¶ 2.
We reverse the Commission’s determination that the asserted claims are indefinite and remand to the Commission for further proceedings consistent with this opinion.
REVERSED AND REMANDED
Costs
Costs to Appellant.

. Because the '258 and '391 patents share the same specification, we cite only to the '258 patent, with the understanding that these citations also refer to the corresponding sections of the '391 patent.

. While the parties both focus their argument on whether the term "virtually free from interference” is indefinite, the entire disputed claim term differs slightly in each of the asserted claims, but it takes the following general form: "virtually free from interference from device transmitted signals operating in the [wireless digital audio system] spectrum." J.A. 11454.

- We have often held that the meaning of claim terms in one patent can be informed by statements made during prosecution of other patents in the same family. We have ex *1065 plained, for example, that “past and future prosecution of related patents may be relevant to the construction of a given claim term.” Teva Pharm. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1343 n.5 (Fed. Cir. 2015).